## Feinstein Estate

206

*Charles F. Nahill*, Special Assistant Attorney General, for Commonwealth.

*I. Jerome Stern* and *Richard F. Stern*, contra.

BOLGER, J., September 17, 1968.—The Commonwealth's exceptions challenge the correctness of the ruling of the hearing judge that decedent's interest in a wholly employer-funded profit-sharing plan was exempt from Pennsylvania inheritance tax. Section 316 of the Inheritance and Estate Tax Act of June 15, 1961, 72 PS §2485-316, provides, in pertinent part:

"Payments under pension, stock-bonus or profit-sharing plans, to distributees designated by decedent or designated in accordance with the terms of the plan, other than the estate of the decedent, are exempt from inheritance tax to the extent that decedent before his death did not otherwise have the right to possess (including proprietary rights at termination of employment), enjoy, assign or anticipate the payments so made. . . ."

At the time of his death, June 6, 1965, decedent was 69 years of age, an employe of the Penn Federal Savings and Loan Association, and a member of the association's trust retirement and benefit plan. Upon his death, the amount credited to his account in that plan, $227,948.74, was paid to the beneficiaries designated by him in his lifetime. The entire amount was assessed by the appraiser for the Department of Revenue. The executors filed a protest which was sustained in part, the department ruling that $182,359, or 80

percent of the amount credited to decedent's account, was includible in his estate. This appeal followed.

The provisions of the plan must be examined. As heretofore stated, it was funded solely by employer contributions. All regular salaried employes who had been such for five years were eligible to participate. A member could retire on the anniversary date nearest his sixty-fifth birthday, anniversary date being defined as any June 30th or December 31st after the effective date of the plan. On retirement, the member was entitled to receive the entire amount standing to his credit in one of three ways, as determined by mutual agreement between the member and the committee charged with administration of the plan: (1) monthly payments, (2) purchase of a life annuity contract, or (3) lump sum payment.

Section 7.1 of the plan provides:

"As of the retirement date of a Member, he shall retire from the employ of the Employer unless the Employer by its Board of Directors upon the request of the Member shall approve his continuing as an Employee of the Employer on a year to year basis. If such Member so continues in the employment of the Employer, he shall continue to be treated in all respects as a Member until his actual retirement. No retirement benefits shall be payable to a Member until his actual retirement".

If a member terminated employment for reasons other than disability or retirement, he was entitled to receive up to a maximum of 80 percent of the amount credited to his account. This nonretirement benefit was to be paid in five annual installments, the first within three months of severance. In the discretion of the committee any payment could be accelerated.

If a member died prior to receiving any or all of the amount to which he was entitled, whether he was an

employe, a retiree or an ex-employe, the balance of the funds to which he was entitled was paid to the beneficiaries designated by him.

A member or his beneficiary could not assign or anticipate any interest in the fund, nor was his interest subject to attachment, etc.

The hearing judge held that this appeal is controlled by Huston Estate, 423 Pa. 620 (1967). In that case, decedent was a retired employe entitled under an employer-funded profit-sharing plan to monthly retirement benefits until her portion of the plan had been entirely distributed. She died before receiving her full share, and the balance due her passed to her designated beneficiary.

Under the plan upon reaching retirement age, the employe was entitled to monthly installments ending at death or the expiration of a period of years based upon the employe's life expectancy. In the event of death prior to full distribution of the employe's share, the balance was paid in the discretion of the trustee in monthly installments or a lump sum to the designated beneficiary. In the event of the resignation or discharge of any employe prior to normal retirement age, the employe was entitled to a certain percentage based upon years of employment, with seven years entitling the employe to 100 percent of his share. However, such an employe was not entitled to receive any benefits until attaining normal retirement age, and then only in the same manner as though he had continued in employment until retirement age. In the event of the death of such an employe prior to reaching normal retirement age or before full distribution of his share, payments were continued to the designated beneficiary, either in monthly installments or in a lump sum as the trustee decided. Where employment was terminated by death, the entire employe's account was payable to his designated beneficiary

either in monthly installments or in a lump sum at the trustee's discretion.

No employe or beneficiary could assign or transfer any interest or rights in the plan which contained a standard spendthrift provision.

Decedent retired under the plan but died before she received full distribution and the balance was paid to her designated beneficiary. The Commonwealth sought to tax the portion of the fund which passed to the beneficiary. In dealing with the Commonwealth's contention that decedent owned the undistributed portion of her account, the court stated, at 423 Pa. 623:

"The lower court stated that §316 'subjects to tax employment benefits wherein the employe may enjoy, assign or anticipate benefits before death, or would have such proprietary rights upon termination of employment prior to death.' In this case, decedent had no such rights in the unused portion of the fund, and the exemption of §316 applies. The only interest decedent had during her lifetime in the unused balance of her fund was the right to designate a beneficiary. Such a right is not regarded as a taxable event under these circumstances".

In answer to the Commonwealth's contention that decedent had the right to enjoy the fund subject to the restrictions set, the court further stated, at page 624:

"Again the Commonwealth is mistaken. The term 'enjoyment' or 'enjoy' as used in statutes relating to estate taxes connotes substantial present economic benefit. Commissioner of Internal Revenue v. Estate of Holmes, 326 U.S. 480 (1946); Estate of McNichol v. Commissioner of Internal Revenue, 265 F. 2d 667 (3rd Cir. 1959). Clearly, during her lifetime, decedent could receive no such benefit from the fund here in question. Accordingly, she did not enjoy the fund, and

the Commonwealth's attempt to equate enjoyment with ownership must fail".

The court held that the undistributed portion of the fund was exempt from inheritance tax by virtue of section 316. It concluded:

"In a nutshell, §316 exempts from taxation those employment benefits which the employe did not have the right to enjoy in any manner during his lifetime. Since decedent lacked the right to enjoy in any manner the undistributed portion of her share of the fund, and since the Commonwealth concedes that she had no right to possess, assign or anticipate her portion during her lifetime, that sum is exempt from the Pennsylvania Inheritance Tax".

In the instant case, the hearing judge reasoned that if decedent had retired on the date of his death, he would have been compelled to wait 23 days until June 30, 1965, the nearest anniversary date, before he could receive any retirement benefits or that if decedent's employment was severed on that day for reasons other than retirement or disability, he could not have enforced payment of the nonretirement benefit to which he was entitled (80 percent of the amount standing to his credit) for a period of three months. As a consequence, it was held that on the date of death decedent was not in a position to demand any of the proceeds of the plan, and that his death prior to that time meant that decedent lacked the right to possess, enjoy, assign or anticipate any of the proceeds of the plan. The hearing judge concluded that the proceeds passing to decedent's beneficiaries were tax exempt.

We agree with the learned hearing judge that decedent's interest in this plan, which passed to his beneficiaries, is tax exempt. There are additional grounds upon which to base this conclusion. They follow.

It is a significant factor in determining just what decedent's interest in this fund was. At the time of

his death he was 69 years old. Having passed age 65, he was entitled upon retirement to receive 100 percent of the amount credited to his account in one of the three specified ways. It is an anomaly to consider decedent as also retaining after age 65 the right to receive only 80 percent of his account upon termination for a reason other than retirement or disability. Apparently, however, it was on this ground that the Department of Revenue sustained in part the executors' protest, reducing the appraisement to 80 percent of the amount paid to the designated beneficiaries. The only reasonable construction of the plan is that after a member passes 65 and continues to be an employe, his right to receive 80 percent under the conditions set forth in the plan merged into and became part of the greater right under the plan to retire and receive 100 percent. The plan itself does not so state; it would be superfluous for it to do so. The intention of the drafters is clear that an "overage" employe has only the right to retire and receive 100 percent. Certainly, no member who has passed age 65 would find it advantageous to voluntarily sever his employment other than by retiring and thereby entitle himself to only 80 percent, when he could simply retire and entitle himself to 100 percent. Likewise, it is impossible to visualize a situation in which the employer could dismiss an overage employe (e.g., for insubordination) and expect that the trustees would pay him only 80 percent of his account. It flies in the face of logic and reason to construe the plan in such a way that once an employe has acquired the right to receive 100 percent of his account, he can be treated in a manner that results in his only receiving 80 percent.

It is noted but not deemed to be of any significance for present purposes that the plan provides that if an employe is dismissed because of dishonesty or the

commission of a criminal act, his interest in his account is lost and becomes zero.

Thus, at his death decedent had only the right to retire and upon such retirement to receive 100 percent of his account in retirement benefits. Except for the fact that decedent had not retired, at his death he was in the same position as decedent in Huston Estate, supra. There, mere entitlement to future retirement benefits was held to be an insufficient nexus to the fund to require includibility on the grounds that decedent possessed or enjoyed the fund.

We are mindful of the phrase "before his death" as used in section 316. We do not believe that that phrase is meant to apply to the entire period of his life but to only the time immediately prior to his death, that is, the phrase is to be read as meaning "at death". Otherwise, as we have construed this plan, the Commonwealth might be able to assess a tax on decedent's share because of a right he "lost" more than four years prior to his death. Similarly, if decedent had been dismissed for dishonesty and had lost whatever interest he had had in the fund, the Commonwealth could assess a tax to the extent of his interest prior to dismissal if "before his death" means during his entire life.

The Commonwealth relies primarily on Dorsey Estate, 366 Pa. 557 (1951). The Transfer Inheritance Tax Act of June 20, 1919, P. L. 521, under which Dorsey was decided, contained no provision similar to section 316 of the 1961 Act which states a new philosophy of inheritance taxation dealing with retirement benefits. There it was held that the fund belonged to decedent and the transfer of it to his designated beneficiaries was a gift intended to take effect in possession or enjoyment at or after decedent's death. Significantly in that case, decedent at the time of his death was entitled, if he desired, to draw out all

of the fund standing to his credit without severing his employment. Because of this fact, the same result would be reached in Dorsey under section 316 of the 1961 Act as was reached under the 1919 Act, since decedent had the right to possess and enjoy the fund. As we construe this plan, we are satisfied that at the time of his death, decedent had no rights in the fund except to receive it in the form of a retirement benefit.

As heretofore stated, Huston Estate holds that decedent must receive "substantial present economic" benefits and that the mere right to receive retirement benefits did not constitute such a substantial present economic benefit.

In applying this construction of the Act of 1961 to the facts of this case, we are satisfied that no taxable event occurred here.

### DISSENTING OPINION

SHOYER, J.—A majority of my colleagues have found that Myer Feinstein, decedent, 69 years old but not retired, lacked a "substantial present economic benefit" in his company's pension fund, and consequently occupied a reduced status equivalent to that of the retired pensioner in Huston Estate, 423 Pa. 620.

The flaws in their reasoning are clearly demonstrable. This pension plan guaranteed decedent no less than five optional benefits, any four of which he might "possess" and "enjoy" in his lifetime. Thus, in the event of his temporary or permanent disability, or his retirement, he would receive 100 percent of the amount previously allocated by the employer to his individual account. Temporary disability payments would be payable in monthly installments, but permanent disability and retirement benefits could be accelerated by the committee or "paid forthwith in a lump sum" by mutual agreement between the member and the committee: Art. 7.3.3. Any balance of

installments remaining in the member's account at death would be paid to a named beneficiary. Here, the full amount (which we may call the fifth option) was payable because decedent was fully employed and drawing salary up to the time of his death.

After five years employment, plus one to 10 years membership in the retirement fund, a member of this plan could resign and withdraw from 35 percent to 80 percent of the amount in his member's account. Any balance remaining after such resignation would be forfeited to the fund for the benefit of other members.

All of the above options were open and available to Feinstein at the time of his death. His failure to select any of the first four did not deprive him of his right of election; it merely left decedent's beneficiary entitled to benefits under the fifth option, which Feinstein well understood would become effective automatically upon his failure while living to have changed to one of the other four benefits.

No court has the power to eliminate any of the various options to "possess" and "enjoy" his member's account in this pension plan, which were available to this decedent up to the moment of his death. No court has the right to make his election for him, in the absence of a prior adjudication of his incompetency. My colleagues, ignoring the fact that Huston *had made* his selection, have clearly exceeded the bounds of their judicial authority as to Feinstein.

Contrast these enumerated facts with the restricted situation in Huston where decedent had exercised his right to retire and was receiving monthly benefits, all of which, if and as received *and unexpended*, would become part of his taxable estate. Significantly, he had no right to anticipate or accelerate these installments, unlike the right of Feinstein to obtain his full member's account in a lump sum *forthwith* upon mutual agreement with the committee. In

Dorsey Estate, 366 Pa. 557, our Supreme Court indicated that such required assent by the employer to the mode of payment did not detract from decedent's rights in the fund, "but governed only the form in which he or his designated beneficiary or his estate would receive it": page 561. Huston, having elected to retire, and having no present economic interest or benefit in the unpaid installments which would go to his named beneficiary, and not his estate, presented a tax picture which was understandably within the exemption of section 316.[1]

If we inject the personal equation into the unadorned black and white contract picture as my colleagues have done, we must perforce make the following observations. Mr. Feinstein was president of the company and had been since December 16, 1952, when the plan was adopted, or earlier. He had also served as one of the three trustees of the pension fund. If he wished to continue as an employe beyond the normal "retirement date" of age 65, he could do so with the approval of the employer's board of directors.[2] As president of the company, his mere request to continue as an employe may well have been tantamount to the requisite approval, so that assent by the board of directors would have been purely perfunctory. Comparing the high executive office held by decedent with his advanced age, one must inevitably conclude that his official status so completely overshadowed his age, as to reduce the latter to utter insignificance.

---

[1] Under the instant Penn Federal plan, a retired member *receiving* monthly installments may, nevertheless, agree with the committee for payment of the balance in a lump sum or the purchase of an annuity for life: Article 7.4. Feinstein's rights even *after retirement* would, therefore, be more extensive than those of the pensioner in Huston, in Enbody and Burke Estates, 85 D. & C. 49, 3 Fiduc. Rep. 344.

[2] By article 7.2, retirement could come as early as age 55.

The learned hearing judge allowed the taxpayer's appeal on the theory that a delay of 23 days in obtaining the pension funds on retirement deprived decedent of possession and enjoyment. His reasons were alluded to in the majority opinion. I can see no merit in granting an exemption because of such slight delay. Even savings fund societies can enforce a delay of 60 days if they so choose (7 PS §503 (b)), yet a decedent's moneys held in his name in a savings fund are unquestionably subject to inheritance tax: Housekeeper's Estate, 10 D. & C. 494, 498. Under the instant plan, the delay could be reduced to a mere 24 hours or less, if decedent appropriately timed his application for retirement. Actually, it would be a rare case when retirement was requested without a longer planning period by the employe of more than six months. The theory of the hearing judge I find entirely too tenuous on which to base an exemption from inheritance tax. Especially is this true when we observe the statutory admonition that provisions exempting persons and property from taxation shall be *strictly* construed: 46 PS §558(5).

To me, when we examine the factual situation of Huston, Burke and Enbody, the distinction is clear. Once the employe has actually retired and named a beneficiary, as he had in those cases, the mere right of selecting a substitute beneficiary is not the privilege to "possess" or "enjoy", or to exercise a proprietary right in the unpaid installments. And that was the single issue involved in each of those cases. Whatever rights and privileges the deceased taxpayer may have had *prior* to retirement, those earlier proprietary rights had all been extinguished by decedent's voluntary selection of retirement benefits payable in installments. When death occurred, the status of each retired pensioner was fixed and immutable; his claim to the unpaid installments then became vested

in a third-party beneficiary just as in any policy of insurance covering the life of decedent. Recognition by our Supreme Court of this similarity is implicit in Huston, where it is said, page 623:

"In this case decedent had no such rights [to enjoy, assign or anticipate benefits] in the unused portion of the fund, and the exemption of §316 applies. The only interest decedent had during her lifetime in the unused balance of her fund was the right to designate a beneficiary. Such a right is not regarded as a taxable event under these circumstances".[3]

With decedent's employe status intact at time of death, he did have unexercised proprietary rights in the pension fund which are subject to tax within the meaning and intent of section 316. His ownership of his member's account was just as absolute as his ownership of any stocks, bonds or cash held in his name at death. The right to possess and enjoy were unmistakably his, and his alone. Transfer of these rights to a named beneficiary occurred at death, was testamentary in nature and, therefore, taxable.

Hence, I dissent.

Judge Burke joins in this dissent.

---

[3] Section 316 does not go the whole way in exempting pension funds as does section 303 with regard to life insurance. In Huston Estate, our Supreme Court has astutely discerned the limit to which the legislature was willing to go. Perhaps some day the legislature will go all the way and exempt pension funds completely from inheritance tax. It has not yet done so.