## Estate of Griffiths

*Donald F. Copeland,* for accountant.
*Barbara Ann Duffy,* for the Commonwealth, Department of Revenue.

TAXIS, *S.J.,* November 2, 1995—The second and final account of Robert D. Griffiths, executor, for the estate of Robert M. Griffiths, deceased, was examined and audited by this court on September 5, 1995, and re-examined on November 2, 1995.[1]

Counsel appeared as follows:

Donald F. Copeland, Esquire, for the accountant, and Barbara Ann Duffy, Esquire, appeared on behalf of the Commonwealth of Pennsylvania, Department of Revenue.

The second and final account is stated from May 15, 1994 to June 15, 1995. The gross estate is reported at $1,106,720.36. The accountant reports that there remains a net balance of principal and income on hand and available for distribution of $317,095.87. The net balance on hand consists of cash.

Since the filing of this second and final account, the executor is credited with having paid ($455) from the estate principal for account filing fees.

---

1. Robert M. Griffiths executed a power of attorney by instrument dated July 12, 1990, wherein he appointed his son, Robert D. Griffiths, as his attorney-in-fact.

Attached to the executor's account and, in accordance with 20 Pa.C.S. §3501.2, is the first and final account of PNC Bank N.A., corporate trustee, for the Trust-Ease Agreement of Robert M. Griffiths, settlor, created under deed dated January 11, 1988. This trust terminated by reason of Robert M. Griffiths' death.

The trust account is stated from January 11, 1988 to October 21, 1993. The trustee received gross assets of $1,193,243.13.

During its administration, the corporate trustee is charged with a net gain on the conversion of certain principal assets of $24,423.02, and is credited with having paid ($616.61) in income disbursements, ($1,201,955.06) in principal distributions to either Robert M. Griffiths or the estate of Robert M. Griffiths, deceased, and ($15,094.48) in income distributions to the estate of Robert M. Griffiths, deceased. See pages 10-11 and 21 of the trustee's account for distributions to the estate now before us for audit.

No trust assets remain on hand.

Upon confirmation of the estate account, the court hereby relieves both the personal representative and the corporate trustee of all liability to the persons so notified for transactions shown in the trust account so annexed to the same extent as if the trust account had been separately filed and confirmed.

The transfer inheritance tax assessed has been paid. For reasons stated herein, a refund to the estate for overpayment of inheritance tax is due.

All parties having or claiming any interest in this estate, of whom the accountant has notice or knowledge, are stated to have received written notice of this audit, either individually or by and through their natural guardian and parent, in conformity with the rules of court.

The decedent, Robert M. Griffiths, testator, died testate on October 21, 1993. His will of June 21, 1989, and codicil thereto dated January 31, 1990, were duly probated by the Register of Wills of Montgomery County on October 25, 1993, at which time the register granted letters testamentary to the accountant named herein, who was the testator's designated executor under Item Thirteenth of his will.

In addition to his son, Robert D. Griffiths, the testator is survived by his wife, Vera P. Griffiths (who has since died on September 26, 1994), his daughter, Constance Jane Powell (who has since died on December 27, 1993), and by several grandchildren.

Vera P. Griffiths elected to take under her husband's will, pursuant to which she was the life beneficiary of a marital trust funded with certain realty and the sum of $270,000. Under Item Fifth(2)(c), upon the death of Vera P. Griffiths, the testator directed that the trustee first deduct and pay to the personal representative of his wife's estate an amount equal to the increase in federal estate tax or state death taxes which her estate will have to pay because of the inclusion of the assets under Item Fifth(3) of his will in her gross estate (unless she directs otherwise in her will) and to distribute the then-remaining principal to the person or persons who would then be entitled to share under Item Sixth of his will as though the testator had died at that time.

The real estate to be used to fund the said marital trust was disposed of by Robert M. Griffiths during his lifetime. The sum of $270,000 in cash remained to fund the marital trust. The marital trust was never funded prior to Vera P. Griffiths' death. Robert D. Griffiths, as both executor of the estate of Vera P. Griffiths and Robert M. Griffiths, executed an agreement on November 9, 1994, pursuant to which the estate of

Robert M. Griffiths, deceased, shall pay to the estate of Vera P. Griffiths, deceased, the sum of $14,438, which amount represents 5 percent interest on the sum of $270,000 from October 21, 1993, the date of Robert M. Griffiths' death, to November 15, 1994. The court approved the terms of said agreement and directed the executor to forthwith pay her estate the same pursuant to the January 23, 1995 adjudication of the first and partial account.

The remaining assets of the marital trust corpus, after the payment of $14,438 to the estate of Vera P. Griffiths, deceased, now pass to the testator's children, as the residuary beneficiaries, in accordance with the will and codicil terms, as amended by the terms of the family settlement agreement approved by this court by adjudication of the amended first and partial account of this estate dated January 23, 1995.

The remaining dispositive provisions of the testator's will and codicil thereto, provide for (1) cash bequests of $25,000 to each of Lisa Powell Hoffman (grandchild), Judy Powell (granddaughter), Amy Powell (granddaughter), David Griffiths (grandson), Mark Griffiths (grandson), Tara Griffiths (granddaughter), Robert David Griffiths (son), and Constance Jane Powell (daughter), (2) cash bequests of $5,000 to each of Robert W. Neely III, Beiger Neely, and Allegra Luzi Griffiths.

The accountant advises this court that Beiger Neely, also known as, Robert W. Neely IV, is a minor, who was born on December 3, 1978. In accordance with Item Fourth: (3) of the testator's will and upon the request of counsel for the accountant, the court directed the accountant to deposit said minor's $5,000 bequest in a restricted account, not to be withdrawn until Beiger Neely attains the age of majority or upon earlier order of this court. See January 23, 1995 adjudication.

As stated, Constance Jane Powell survived her father, but has since died testate on December 27, 1993. Constance Jane Powell was domiciled in the State of Illinois at the time of her death. Letters of Office have been granted to Susan Patten on March 16, 1994, by the Circuit Court of Cook County, Illinois.

Susan Patten, as executrix for the estate of Constance Jane Powell, deceased, and Lisa M. Hoffman (formerly Lisa Powell), Judith L. Powell, and Amy E. Powell, as the children and heirs of the late Constance Jane Powell, filed objections to the first and partial account objecting to "a principal distribution of $280,000 from the estate to the executor, for the '[s]atisfaction of note given Robert M. Griffiths [sic] to secure January 17, 1992 loan,' " to principal disbursements of $21,898.85 to various persons, and to a $9,000 advance distribution to Tara Griffiths.

The parties executed a family settlement agreement on December 29, 1994, the terms of which were approved by this court and incorporated as part of this court's adjudication of January 23, 1995 to the executor's first and partial account. The accountant informs this court that the executrix for Ms. Powell's estate has disclaimed its interest in Robert M. Griffiths' estate by disclaimer dated July 15, 1994.

One final issue remains for adjudication.

This estate filed its inheritance tax return on June 27, 1994. The Department of Revenue, Commonwealth, filed its complementary notice of inheritance tax appraisement and tax assessment on November 7, 1994. The estate paid the additional assessed tax, plus accrued interest ($7,486.99) under protest and filed an appeal

from the assessment of inheritance tax with this court pursuant to 20 Pa.C.S. §9186(a)(2).[2]

The estate protests the Commonwealth's assessment of inheritance tax upon: (1) the decedent's retirement allowance from a profit sharing plan, (2) interest due by the decedent on a judgment note in the sum of $27,540, not $19,250, (3) executor's commissions in the sum of $32,866, not $34,000, and (4) attorney's fees in the sum of $36,840, not $41,400. See schedule H, items B.1 and B.2, of the inheritance tax return, as filed.

The Commonwealth concedes the aforesaid items 2, 3, and 4 of the appeal.[3] The protest to the Commonwealth's disallowance of an exemption for the decedent's participation in his retirement profit sharing plan remains outstanding.

The decedent retired as a partner from Price Waterhouse in 1968. His Price Waterhouse retirement benefits package included participation in a profit sharing plan. The material terms of the decedent's interest thereunder are contained in a "retired partner agreement" executed by the decedent and Price Waterhouse on June 30, 1968.

The agreement permitted the decedent to participate in and receive for each of the fiscal years after June 30, 1968, and during the remainder of his life, "a sum

2. The additional tax assessed was $7,303.30. The additional tax paid of $7,486.99 includes accumulated interest to November 24, 1994.

3. The issues raised in items 2, 3, and 4 have been resolved by family settlement agreement as approved by this court by adjudication of the first and partial account on January 23, 1995. The inheritance tax return was filed prior to said adjudication. The Commonwealth now recognizes the terms of this family settlement agreement.

equal to the amount which the retired partner would have been entitled to receive out of the net profits of the partnership for such year." See paragraph 1, clause b of the agreement.

Price Waterhouse was the sole contributor to the decedent's profit sharing plan. Payments thereunder were not intended to, nor treated as compensation to the decedent. The agreement terms prohibited the decedent from any entitlement to compensation from the partnership after June 30, 1968. See paragraph 5 of the agreement.

Payments distributed under paragraph 1 of this agreement were to be made "within one year after the end of the fiscal year." The close of the fiscal year is June 30 of a given year. The decedent, as the retired partner, was forbidden to "sell, assign, mortgage, pledge or otherwise transfer or encumber any of his rights" under clause b of paragraph 1 of this agreement. Any attempts by the decedent or his legal representative(s) to do so could result in immediate cancellation of the profit sharing arrangement. See paragraph 11 of the agreement.

The decedent participated in and received payments under this profit sharing plan until his death on October 21, 1993. His death terminates his benefits under the agreement. His legal representative is entitled to receive *undistributed* payments from the profit sharing plan for the fiscal year ending June 30, 1993 and a pro-rata share of profits for the fiscal year ending June 30, 1994. Profits for the fiscal year ending June 30, 1993 total $78,024. Price Waterhouse intended to pay these profits to the decedent periodically from November 10, 1993 to June 30, 1994. Profits for the fiscal year ending June 30, 1994 total $48,085, an increase of $4,385 over the estimated sum of $43,700 reported on schedule E of the inheritance tax return.

The disputed issue is whether the decedent possessed a vested property interest in the profit sharing plan and in the undistributed profits thereunder.

Section 9111(r) of the Pennsylvania Inheritance Tax Act exempts payments made under pension, profit sharing, and retirement plans from the payment of inheritance tax, if the decedent [here, Mr. Griffiths] *before his death,* "did not otherwise have the right to *possess, enjoy, assign,* or *anticipate* the payment made." (emphasis supplied)

The Commonwealth takes the position: (1) that the decedent's profit sharing plan is deferred compensation, (2) that the decedent's right to profits thereunder for the fiscal year ending June 30, 1993 vested in the decedent on June 30, 1993, four months before the decedent's death, and (3) that the decedent's rights to profits thereunder for the fiscal year ending June 30, 1994 vested in the decedent on the decedent's date of death on October 21, 1993.

The Commonwealth contends that the mere fact that Price Waterhouse had not calculated the decedent's share of its 1993 profits at the time of his death and did not intend to make distributions to the decedent [now his estate] until November 10, 1993 did not divest the decedent of his vested property interest in these profits. The Commonwealth's brief does not discuss undistributed profits for 1994. The Commonwealth cites the leading case, *Dorsey Estate,* 366 Pa. 557, 79 A.2d 259 (1951), to support its position. The Commonwealth views *Dorsey* as analogous to the matter sub judice.

Conversely, the estate maintains that the terms of the partnership agreement did not afford the decedent a vested property interest in the profit sharing plan. The decedent's rights in the profits thereunder could not vest until actual, physical receipt of the monies.

The estate believes that this case is akin to *DeVenuto Estate*, 35 D.&C.2d 352 (O.C. Montg. 1964) and *Burke and Enbody Estates*, 3 Fiduc. Rep. 344 (O.C. Phila. 1953) and distinguishable from *Dorsey Estate, supra*.

Key to our resolution of this issue is our determination as to whether the decedent had the right before his death, that is immediately preceding his death, to "possess," "enjoy," "assign" or "anticipate" the profits at issue.[4] "Possession, control and dominion are fundamental elements of ownership of property." *Burke and Enbody Estates, supra* at 352.

The evolving case law formulates a workable test which, when applied to the elements of a particular transaction, is determinative of whether the decedent possessed merely a vested interest or a vested property right and ownership in the assets in question.[5]

The test requires this court to examine what rights, if any, the decedent possessed under the profit sharing plan. The elements of a given transaction control. The pattern established in the leading case law, as summarized herein, suggests that:

"[T]he mere right to designate the beneficiary of the unconsumed employee benefits, like the right to designate an insurance beneficiary, result[s] in no inheritance tax. However, the addition of other beneficial rights in the decedent, such as the right to assign his benefits, or to withdraw his credit on retirement or

---

4. See *Feinstein Estate*, 45 D.&C.2d 205, 212 (1968), wherein the court defined the statutory phrase "before death" to mean "immediately [preceding] death" that is, "at death."

5. The majority of the cases cited herein apply the Inheritance Tax Return Act of 1961, June 15, P.L. 373, article III sections 301 to 316 (72 P.S. §§2485-301 to 2485-316). Regardless, the reasoning and principles espoused in said cases are sound law and the subsequent acts are in conformity.

resignation, result[s] in taxation. The courts seem to be equating the existence of such rights with an annuity contract." Grossman and Smith, *Pennsylvania Inheritance and Estate Tax,* "Employee Benefits," section 9111(r), paragraph 14.3 (2d rev. ed. 1993). See *Fiduciary Review,* October, 1953, p. 3.

In *Dorsey,* the court held that both the decedent's contributions and those of his employer, Sears Roebuck & Company, to the decedent's account in its savings and profit sharing pension fund, which passed to the decedent's sister as his designated beneficiary, were not subject to inheritance tax. Crucial to the court's determination was a finding that the decedent's share in the pension plan belonged to him during his lifetime, "without any distinction as to the part thereof contributed out of his salary and the part contributed by the company." *Dorsey Estate, supra* at 560, 79 A.2d at 260. The company "regarded its contributions as the property of the depositors during the period of their accumulation in the fund." *Id.* The decedent acknowledged his ownership of the fund under his will wherein he referred to himself as the "owner" of a certain share in the profit sharing plan. The company granted the decedent the right in his lifetime "to withdraw . . . the total amount of the fund credited to him or to make full disposal of it at the time of his death." *Id.* at 561-62, 79 A.2d at 260. After five years of service, a member was entitled, upon ceasing to be a member of the fund, to withdraw all monies credited to his account. The company granted the decedent an *unlimited* right to designate his beneficiary or transferee to the remaining proceeds upon his death. Such rights, the court held, constituted substantial ownership of the assets by the decedent such that at his death, the decedent was transferring his own property to his designated beneficiary

and not acting "merely as the donee of a power of appointment." *Id.* at 562, 79 A.2d at 261.

The companion case to *Dorsey Estate* is *Hoelzel Estate,* 101 Pitts. 77 (O.C. Allegh. 1952). In *Hoelzel,* the Pittsburgh Screw and Bolt Company purchased group annuity contracts for its employees, one of whom included the decedent. The employer funded solely the contracts. The court held that the transfer of the proceeds of this annuity contract to the decedent's designated beneficiary constituted a taxable event. The court reasoned that the decedent's rights under the plan which included an *unlimited right to designate a beneficiary* of the proceeds should the decedent die prior to retirement and the *irrevocable right* held by the decedent *to the proceeds* of his account *at retirement,* but not prior thereto, for a cash surrender value, supported a finding that actual and exclusive ownership vested in the annuitant.

In *Eastlack Estate,* 9 Fiduc. Rep. 303 (O.C. Phila. 1959), although the employee's share was immune from attachment, the participant who was with the company for 21 years and decided to *resign* "did not have to wait until retirement to gain the use of his fund but was *entitled to its enjoyment after only four years* of service." *Huston Estate,* 423 Pa. 620, 624-25, 225 A.2d 243, 245 (1967).

In *Cameron Estate,* 15 D.&C.2d 557 (1958), the court deemed the decedent's deferred compensation plan between the decedent and employer to be an asset of the decedent's estate and the commuted value thereunder payable to his widow thus subject to inheritance tax. The court's decision rested on the decedent's *right to assign* the contract during his lifetime. The court equated the decedent's assignment rights with ownership in the property.

In *Inheritance Tax—Profit Sharing Funds,* 6 Fiduc. Rep. 93 (attorney general 1955), the plain and unambiguous contract language in question defined expressly the decedent's interest as a vested property right. The attorney general deemed the funds subject to inheritance tax.

The facts of the present case resemble closely those of *Burke and Enbody Estates, supra,* and *DeVenuto Estate, supra.* Both cases involve retirement plans funded entirely by the employer. Nothing was payable to an employee who resigned prior to attaining retirement age. Both cases discuss the treatment afforded "unconsumed" or "undistributed" payments under the respective retirement plans. Each decedent was vested merely with the right to designate a beneficiary to said unconsumed payments. Each agreement contained a standard spendthrift clause rendering "unassignable and unattachable any and all rights of its members." *DeVenuto Estate, supra* at 354. Each court held that this interest, in and of itself, was insufficient to vest the decedent with ownership rights to the property.

In the matter sub judice, the decedent did not "possess," "control," or "dominate" the profits as described by *Dorsey Estate* and its line of cases.

The profits arising under this agreement do not represent property belonging to the decedent or assets to which he could lay claim to prior to his actual, physical receipt of the funds. The decedent made no contributions to this fund. The decedent's retirement was a condition of the agreement. This profit sharing plan was not a benefit which arose during his tenure as a partner at Price Waterhouse. Unlike *Eastlack,* the profits in ques-

tion were not subject to a withdrawal of accrued credit by reason of the decedent's retirement or resignation.[6]

The decedent was not guaranteed payment of a sum certain under the agreement. Unlike the facts in *Dorsey* and *Hoelzel Estates,* Mr. Griffiths could not reduce his contract rights to a cash surrender value upon his retirement or at any time thereafter. The decedent's interest in this fund was contingent upon the corporation realizing partnership profits in a given year. The decedent's participation in the profit sharing plan ceased upon his death.

The decedent could not "assign" or "anticipate" his interest in the profits, including undistributed profits for fiscal years 1993 and 1994.

Anticipation is the "act of doing or taking a thing before its proper time." *Black's Law Dictionary,* 85 (5th ed. 1979). For the decedent to "anticipate" undistributed profits under the agreement, he must have "expected" or "foreseen" the use of money before it was available. *American Heritage Dictionary,* 57 (10th ed. 1981).

Unlike *Cameron Estate, supra,* the terms of paragraph 11 of the retired partner agreement precluded the decedent from selling, assigning, mortgaging, pledging, transferring, or otherwise encumbering his rights to profits arising under paragraph 1, clause b of the agreement. This spendthrift provision divested the decedent of an

---

6. See *Eastlack,* 9 Fiduc. Rep. at 307, wherein the court distinguished instruments which involve employers' pension trusts for the benefit of retired employees [similar to the profit sharing plan herein] from those instruments where the benefits accrue during employment and extend thereafter past retirement, noting that the former instruments approximate insurance contacts, the proceeds of which are exempt from tax.

ownership interest in the assets in question. See *Burke and Enbody Estates, supra* at 351, 360; *DeVenuto Estate, supra* at 354. A breach of this provision could invalidate the agreement and jeopardize the decedent's participation or that of his legal representative in the profit sharing. See paragraph 4 of the retired partner agreement.

The decedent did not "enjoy" the profits.

The term "enjoy" as used in statutes relating to estate taxes connotes "substantial present economic benefit." *Commissioner of Internal Revenue v. Estate of Holmes,* 326 U.S. 480 (1946); *Estate of McNichol v. Commissioner of Internal Revenue,* 265 F.2d 667 (3rd Cir. 1959); *Huston Estate, supra* at 624, 225 A.2d at 245; *Feinstein Estate,* 45 D.&C.2d 205, 209-210 (1968). Immediately preceding October 21, 1993, the decedent had no present economic benefit in profits realized for the fiscal year ending June 30, 1993, nor in potential profits for the fiscal year ending June 30, 1994. The decedent's mere expectation of those profits is an "insufficient nexus to require includibility on the grounds that the decedent possessed or enjoyed the fund." *Feinstein Estate, supra* at 212.

The Commonwealth's argument that Mr. Griffiths' right to designate his beneficiary to receive undistributed profits evidences his ownership interest in the profit sharing plan and creates a taxable event is unpersuasive.

The mere right of the decedent to designate a beneficiary is insufficient to trigger a taxable event. *Huston Estate, supra* at 623. The *Huston* court suggested that such designation rights do not rise to the level of "enjoyment" and "possession" as dictated by statute. See *DeVenuto Estate, supra* at 360; *Burke and Enbody Estates, supra* at 353, 358 (wherein the court distinguishes the right to designate the beneficiary from the right

of ownership). Moreover, the mere right of the decedent to designate those beneficiaries entitled to receive undistributed or unconsumed profits upon his untimely death is deemed insufficient to establish a vested property right in the profits. See treasury regulation 93.131(d) issued by the Department of Revenue and interpreting section 9111(r) of the Pennsylvania Inheritance Tax Act. Rights of designation are often likened to powers of appointment, which is a granting of the right to transfer *another's* property.

We acknowledge that the Pennsylvania Supreme Court in *Bayer's Estate,* 345 Pa. 308, 26 A.2d 202 (1942) appears prima facie to come to the opposite conclusion. However, *Bayer's Estate* is distinguishable as the court never addressed the issue of whether the decedent "owned" the assets in question as the issue was never raised. Moreover, as in *Hoelzel, supra,* the annuitant had absolute control over the disposition of the fund during his lifetime. *Burke and Enbody Estates, supra* at 353.

The agreement under consideration restricted payments of unconsumed or undistributed profits upon Mr. Griffiths' death to his legal representative. Unlike the decedent in *Bayer's Estate, supra,* Mr. Griffiths had no *unlimited* right to designate a beneficiary or transferee to receive said assets.

The Price Waterhouse agreement is devoid of language which defines Mr. Griffiths' interest in the profit sharing plan as being fully vested. For this reason, this case is distinguishable from *Inheritance Tax—Profit Sharing Funds, supra.* Unlike *Dorsey,* there is no indication that Mr. Griffiths acknowledged in his will his understanding of any vested property interest and ownership under this agreement.

The foregoing discussion establishes that before the decedent's death on October 21, 1993, Price Waterhouse

"possessed," "controlled," and "dominated" the profits for fiscal year 1993 and any possible, pro-rata profits for fiscal year 1994.

The decedent died prior to Price Waterhouse's calculation and distribution of profits realized for its fiscal year ending June 30, 1993. The decedent died four months into the 1994 fiscal year and eight months before its close. Price Waterhouse had no indication either before or at the time of the decedent's death what profits, if any, it would achieve for the 1994 fiscal year. Under the agreement, any profits for the fiscal year ending June 30, 1994 would not be disbursed until within the year *after* the end of 1994 fiscal year. "Consequently, there was no transfer of decedent's property to his estate beneficiaries." *Burke and Enbody Estates, supra* at 352. Rather, there was a transfer of Price Waterhouse's profits to the Estate of Robert M. Griffiths, deceased. This transfer is not a taxable event.

"The cases share a common thread. If the employee [or as, here, the retired partner], might have anticipated his benefits prior to retirement, the value of what he appoints to his beneficiary is taxable. If his right— although vested—is limited to designating a beneficiary such value is not taxable." *Fiduciary Review,* October 1953, p. 3. Such a mere right is nothing more than that available under an insurance contract. Only where the benefit plan mirrors an annuity contract, that is, a contract which permits the assignment of rights, rights of withdrawal, including the right to withdraw credit on retirement or resignation, may the transaction give rise to a taxable event.

Mr. Griffiths had, at most, a limited designation power over the undistributed and unconsumed profits for the fiscal years 1993 and 1994.

The appeal is sustained, and the assessment of inheritance tax against the profit sharing plan is stricken

from the inheritance tax appraisement. The Commonwealth is to refund to this estate the sum of $7,486.99.

No other questions are before this court for adjudication.

Subject to the views expressed herein and subject to distributions heretofore properly made, the net ascertained balances of principal and income are awarded as set forth in the last paragraph of the petition for adjudication.

Power and authority are given the accountant to make the necessary transfers and assignments of the unconverted investment securities herein awarded in kind.

The second and final account is confirmed, and it is hereby ordered and decreed that Robert D. Griffiths, executor, as aforesaid, forthwith pay the distributions herein awarded.

And now, November 2, 1995, this adjudication is confirmed nisi.

Exceptions to this decree nisi must be filed within 10 days of the date of this adjudication; otherwise, this decree will become final at the expiration of said time.